**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**

**ANTHONY O SECRET, JR.,**

       **Plaintiff,**

**v.**                                **CIVIL ACTION NO. 1:03CV77**
                                           **(Judge Keeley)**

**UNITED STATES OF AMERICA,**

       **Defendant.**

### MEMORANDUM OPINION AND ORDER

This is an action seeking a refund of monies paid to the United States as trust fund recovery penalty taxes. The Court held a bench trial in the matter on October 13, 2004. The parties subsequently filed post-trial memoranda pursuant to the briefing schedule set by the Court. The Court now states its findings of fact and conclusions of law in accordance with Rule 52(a) of the Federal Rules of Civil Procedure. As discussed below, the Court concludes that the plaintiff, Anthony Secret, is not a "responsible person" under 26 U.S.C. § 6672 and thus cannot be held liable for the assessed trust fund recovery penalty.

### I.  FINDINGS OF FACT

**A.   Michael Veltri's Purchase of Muriale's Restaurant**

In the mid-1990s Michael Veltri began working for Muriale's Restaurant, Inc. ("Muriale's") in Fairmont, West Virginia. (Tr. at 171.)  At that time, Veltri's cousin, Rocco Muriale, owned the

business. (Tr. at 170-71.) In April of 1999, amidst cash-flow difficulties and concerns about his wife's health, Rocco Muriale sold the restaurant to Veltri. (Tr. at 170-73, 249.) As part of the purchase agreement, Veltri agreed to assume all of the restaurant's outstanding liabilities, including a payroll tax debt. (Tr. at 182, 229, 263.)

Prior to the change in ownership, Rocco Muriale performed most of the restaurant's bookkeeping, although Secret & Shields, A.C. ("Secret & Shields"), a local accounting firm, handled the restaurant's employee payroll. (Tr. at 171-72.) After buying the restaurant, Veltri assumed the role of operator or general manager. (Tr. at 171.) His responsibilities included ordering, managing employees, negotiating with vendors and making cash deposits. (Tr. at 172.) Veltri had no training or experience in accounting and finance; therefore, he asked Secret & Shields to perform some of the bookkeeping services that Rocco Muriale had traditionally done. (Tr. at 170, 172.) Veltri testified that, given the restaurant's history of cash flow problems and late payments to vendors, he believed having an accounting firm handle the finances of the business would also bolster the credibility of Muriale's. (Tr. at 173.) Thus, Secret & Shields not only continued to handle the payroll for Muriale's, but the firm also began to review accounts payable and prepare corporate tax documents. (Tr. at 172-73.)

Secret & Shields charged $1,500 per month for these services.  (Tr. at 259.)

## B.   Anthony Secret's Duties

Anthony Secret, the plaintiff, is a Certified Public Accountant ("CPA") at Secret & Shields who performed the contracted services for Muriale's.[1]  During Veltri's ownership of Muriale's, Secret was a signatory on all of the corporation's bank accounts.  (Tr. at 285-86.)  However, he was only allowed to issue checks upon Veltri's prior approval.  (Tr. at 179, 259, 271.)  In some rare instances, vendors contacted Secret directly about payment of Muriale's invoices, but Veltri always decided which vendors to pay.  (Tr. at 270-71.)  Moreover, Secret never issued a check without Veltri's approval or direction.  (Tr. at 271.)

Secret also supervised the preparation of Muriale's payroll checks.  (Tr. at 241, 248.)  Since 1990, Secret & Shields has performed payroll services for Muriale's.  (Tr. at 241.)  Kim Piercy, Muriale's office manager, tracked the payroll information of all the employees at Muriale's.  (Tr. at 133.)  Using information stored in Muriale's cash register system, Piercy submitted a spreadsheet to Secret & Shields detailing each employee's hourly rate and the number of hours worked during a

---

[1]   In addition, Secret and Veltri have been friends for over 20 years.

given pay period. (Tr. at 134-38). The staff at Secret & Shields would then input this information into its payroll software and generate payroll checks. (Tr. at 139.) Most of the checks were forwarded to Piercy at Muriale's to await Veltri's signature before distribution to the employees. (Tr. at 139.) However, a few of the employees, including Veltri, his wife, his cousin, and the general manager, lived nearby in Clarksburg and would stop at Secret & Shields to personally pick up their paychecks. (Tr. at 157-58, 286-87.) Therefore, Secret had permission to sign these payroll checks as a signatory on the payroll account. (Tr. at 284.) Secret's only other involvement with the payroll was preparing Muriale's quarterly tax returns on the Internal Revenue Service ("IRS") Form 941. (Tr. at 243.)

Secret also assisted Veltri with prioritizing creditor payments. On virtually a daily basis during his ownership of Muriale's, Veltri ate breakfast at the Blue Bird restaurant in Clarksburg, West Virginia and then walked across the street to Secret & Shields to discuss the restaurant's financial position with Secret. (Tr. at 175-76.) During these meetings, Veltri and Secret discussed Muriale's aged accounts payable, its cash flow statement, vendor payment terms, and the restaurant's need for particular products and services. (Tr. 176-78, 203, 255-57.) They reviewed a schedule of Muriale's current payables, aged by date of

each invoice.[2]  (Tr. at 175, 254-55.)  Veltri conferred with Secret about the payables, decided which vendor invoices to pay, then instructed Secret to send checks to those vendors.  (Tr. at 178-79.)  Veltri sometimes sought Secret's advice about creditor payments. (Tr. at 318.)  Although he provided Veltri with relevant information to make such decisions, Secret did not recommend paying one creditor over another. (Tr. at 204.)  Veltri alone decided which creditors to pay.  (Tr. at 228.)

## C.   **The Trust Fund Tax Penalty**

Among the accounts payable that Secret regularly reviewed with Veltri was Muriale's tax liability.  (Tr. at 262-63.) Veltri was aware of the outstanding tax liability when he purchased Muriale's, and Secret continually reminded Veltri to pay this debt.  (Tr. at 262-63.)

Two months after Veltri bought Muriale's, in June 1999, Secret and Veltri met with IRS Revenue Officer William Arthur to discuss the restaurant's delinquent payroll taxes.  (Tr. at 98.)  At that meeting, Veltri indicated that he was in the process of obtaining bank financing in order to pay off the tax liability.  (Tr. at 37-38, 184.)  Veltri and Secret also negotiated a payment plan in which Muriale's made weekly payments of $1,000 toward the unpaid

---

[2]  Secret generated this schedule from creditor invoices sent to Secret & Shields by Muriale's. (Tr. at 140, 175.)

taxes.   (Tr. at 98.)

   In August of 1999, Veltri decided to remodel the restaurant.
(Tr. at 196.)   He hoped that the improvements would increase
business and get Muriale's back on track.    (Tr. at 211-12.)
Unfortunately, the remodeling project only exacerbated the
restaurant's cash flow problems.   (Tr. at 197.)   To make matters
worse, Muriale's loan application was rejected in April, 2000. (Tr.
at 185.)  Consequently, Muriale's payments towards the outstanding
tax liability decreased.   (Tr. at 85.)

   After learning about the remodeling project and the failed
attempt to obtain financing, Revenue Officer Arthur held another
meeting with Veltri and Secret on May 2, 2000.    (Tr. at 40).
Arthur called the meeting to discuss the possible assessment of a
a trust fund recovery penalty. (Tr. at 41.)  This purpose, however,
was not clear to either Veltri or Secret.   (Tr. at 185, 267.)

   During the meeting, Arthur interviewed both Secret and Veltri
to determine who was a "responsible person" with respect to the
trust fund recovery penalty for the delinquent payroll taxes.  (Tr.
at 45-46.)  Arthur recorded the answers to his questions on a Form
4180 entitled "Report of Interview with Individual Relative to
Trust Fund Recovery Penalty or Personal Liability for Excise Tax,"
using a separate form for Secret and Veltri.   (Tr. at 47-48.)
Under the heading "Section II - Ability to Direct," the form lists

-6-

a number of yes or no questions designed to determine responsibility for trust fund penalty taxes. (Pl.'s Ex. 2.) On the Form 4180 that Arthur completed as to Secret, the following questions were answered in the affirmative:

> (3) did you direct (authorize) payment of bills,
> (4) did you deal with major suppliers and customers,
> (7) did you sign/countersign corporate checks,
> (9) did you make/authorize bank deposits,
> (10) did you authorize payroll checks,
> (11) did you prepare federal payroll tax returns,
> (14) did you authorize payment of federal tax deposits,
> (15) did you review federal income tax returns,
> (16) did you determine company financial policy.

(Pl.'s Ex. 2.)

After completing his interview, Arthur handed the form back to Secret to review and sign. (Tr. at 126-27.) Without making any corrections or additions, Secret signed the Form 4180 immediately below a sentence that states, "I declare that I have examined the information given in this statement and, to the best of my knowledge and belief, it is true, correct and complete." (Pl.'s Ex. 2.) Secret testified, however, that he did not read the form, thinking it was a power of attorney form. (Tr. at 267.) Veltri also testified that he did not understand the effect of signing the Form 4180. (Tr. at 229-31.)

-7-

**MEMORANDUM OPINION AND ORDER**

After the Form 4180 interview, Secret also stated that he would "take responsibility for this." (Tr. at 71, 129.) Arthur interpreted this statement to mean that Secret conceded responsibility for Muriale's delinquent taxes. (Tr. at 73.) Secret does not recall making this specific statement but denies ever admitting liability for the taxes. (Tr. at 333-34.) Furthermore, neither Secret nor Veltri understood that Arthur's interview concerned the possible imposition of a trust fund penalty. (See, e.g., Tr. at 231, 273.)

Secret first became aware of the imposition of the trust fund penalty when he attempted to refinance a mortgage in January of 2001 and was informed by his attorney that he had federal tax liens on his property.[3] (Tr. at 277-78.) Immediately after learning about the tax liens, Secret contacted Arthur to inquire about the assessment. (Tr. at 278.) Arthur recommended that Secret send a letter explaining the role he played for Muriale's. (Tr. at 278, 323-25.) The letter, dated February 2, 2001 and addressed to Arthur, states in relevant part:

---

[3] Secret previously received letters from the IRS notifying him of the trust fund penalty assessment, but he maintains that he did not realize that the letters pertained to him personally. Instead, he believed that the letters were sent to him regarding Muriale's tax liability. The letters were sent to the P.O. Box address for Secret & Shields. (Tr. at 273-77.)

> Although I was authorized to sign checks for
> the corporation, I, at no time, had any
> authorization on the priority of payments to
> the vendor or taxing agencies, on who should
> and would get paid and how much was to be
> paid. All of these decisions came from
> Michael and the corporate offices in Fairmont.
>
> . . .
>
> I constantly stressed the importance of paying
> [the tax liability] on a timely basis.
> However, it seemed as though there never was
> any cash available in the checking accounts
> that I was paying from in order to make these
> tax deposits.
>
> . . .
>
> I am fully aware of the severity of this tax
> liability owed by the corporation to the
> Internal Revenue Service. I am also aware
> that during a meeting in March or April 2000
> in your office I signed papers stating that I
> would be responsible on behalf of Muriale's
> Restaurant, Inc. However, it was my firm
> belief at the time that the company would be
> able to work itself out of the financial and
> cash flow problems that it had inherited when
> Michael took over, secure new financing, and
> pay off the liability in full.

(Def.'s Ex. 36.)

Despite this letter and other efforts to challenge the trust

fund penalty, the IRS continued to hold Secret personally liable

for Muriale's delinquent payroll taxes. Subsequently, Secret paid

a portion of the trust fund penalty assessment and filed this

action for a refund. The Government filed a third party complaint

against Veltri, who settled before trial for $50,000. (Tr. at

168.)

**D.    Epilogue**

In February of 2001, Rocco Muriale again took ownership of Muriale's, purchasing the restaurant back from Veltri.    (Tr. at 167-68.)    At that time, Secret & Shields discontinued its accounting services for Muriale's, except for its payroll function. (Tr. at 248-49.)

## II.    CONCLUSIONS OF LAW

**A.    Legal Standard**

"The Internal Revenue Code requires that employers withhold federal income taxes and social security taxes from their employees' wages." Plett v. United States, 185 F.3d 216, 218 (4th Cir. 1999) (citing 26 U.S.C. §§ 3402(a), 3102(a)).    These withholdings are known as "trust fund taxes" because they are held in trust for the United States.    Id.    Under 26 U.S.C. § 6672, the IRS can impose a trust fund penalty to recover such taxes which an employer fails to remit to the government.    O'Connor, 956 F.2d at 50.    The penalty allows the IRS to pierce the corporate veil and reach anyone who is responsible for the payment of payroll taxes. De Alto v. United States, 40 Fed. Cl. 868, 874 (1998).

The trust fund penalty applies to "[a]ny person required to collect, truthfully account for, and pay over any tax imposed by this title who willfully fails to collect such tax, or truthfully account for and pay over such tax, or willfully attempts in any

-10-

manner to evade or defeat any such tax or the payment thereof." 26
U.S.C. § 6672.  Thus, for a person to be held liable under § 6672,
he must (1) be a "responsible person" required to truthfully
account for, collect, and pay over the taxes; and (2) willfully
fail to insure that the withholding taxes were paid.  O'Connor, 956
F.2d at 50 (citations omitted).

To identify a "responsible person" under § 6672, the "crucial
inquiry is whether the person had the 'effective power' to pay the
taxes--that is, whether he had the actual authority or ability, in
view of his status within the corporation, to pay the taxes owed."
Plett, 185 F.3d at 219 (quotation omitted).  "[T]he 'responsible
person' is not limited to one person in a company, but may include
many persons connected with the same employer."  Id.

According to the Fourth Circuit, factors indicating the
requisite authority include whether the employee:

> (1) served as an officer of the company or as a member of
> its board of directors; (2) controlled the company's
> payroll; (3) determined which creditors to pay and when
> to pay them; (4) participated in the day-to-day
> management of the corporation; (5) possessed the power to
> write checks; and (6) had the ability to hire and fire
> employees.

Id. (citing O'Connor, 956 F.2d at 51; United States v. Landau, 155
F.3d 93, 100-01 (2d Cir. 1998); Barnett v. Internal Rev. Serv., 988
F.2d 1449, 1455 (5th Cir. 1993)).  These factors, however, are
only "indicia of a responsible person," O'Connor, 956 F.2d at 50,

and "no one factor is determinative." <u>Landau</u>, 155 F.3d at 101.
Weighing the totality of the circumstances, a court must "undertake
a pragmatic, substance-over-form inquiry" to determine whether an
employee is a responsible person. <u>Plett</u>, 185 F.3d at 219; <u>Landau</u>,
155 F.3d at 101.  Thus, a court's analysis of whether the party had
the  "status,  duty  and  authority  to  avoid  the  default"  is
"necessarily fact intensive." <u>De Alto</u>, 40 Fed. Cl. at 875.

The plaintiff bears the burden of rebutting the IRS's tax
penalty assessment by a preponderance of the evidence. <u>O'Connor</u>,
956 F.2d at 50; <u>Fiatarulo v. United States</u>, 8 F.3d 930, 938 (2d
Cir. 1993).  Thus, the plaintiff must disprove either that he was
responsible for the collection and payment of withholding taxes or
that he willfully failed to insure that the taxes were paid.
<u>Fiatarulo</u>, 8 F.3d at 938.

**B.  Analysis**

The  factors  enumerated  in  <u>Plett</u>  provide  the  analytical
framework for identifying responsible persons under § 6672. <u>Plett</u>,
185 F.3d at 222.   Applying those indicia here, the Court first
notes that the following facts are clearly undisputed:  Secret did
not serve as an officer or board member for Muriale's; he did not

participate in the day-to-day management[4] of the corporation; and he did not have authority to hire or fire employees.

### 1.   *Control of the Company's Payroll*

The Government does not explicitly argue that Secret controlled the company's payroll, but it emphasizes that Secret was responsible for <u>processing</u> payroll. The evidence establishes, however, that only Veltri had ultimate authority over Muriale's employees' pay. <u>White v. United States</u>, 372 F.2d 513, 520 (Ct. Cl. 1967), <u>cited with approval in</u> O'Connor, 956 F.2d at 51. Indeed, Veltri determined the work schedule and pay rates for all employees. (Tr. at 174.) Thus, Secret did not "control" the company's payroll for purposes of the responsible person inquiry.

### 2.   *Authority to Pay Creditors*

The focus of the parties' dispute in this case is whether Secret had effective authority to pay creditors. This issue implicates the two remaining <u>Plett</u> factors--Secret's check signing authority and the extent of his ability to choose which creditors to pay.

Secret was a signatory on all of Muriale's bank accounts, including the payables account, the payroll account, and the house

---

[4] The Court construes "day-to-day management" to mean daily oversight of business operations. <u>See</u> <u>Godfrey v. United States</u>, 748 F.2d 1568, 1575 (Fed. Cir. 1984); <u>O'Connor</u>, 956 F.2d at 51.

account.   He  regularly  signed  some  payroll  checks  for  the
convenience of certain employees, and he issued checks to creditors
as directed by Veltri.  Based on Secret's responsibilities and his
purportedly unrestricted check signing authority, the Government
maintains that Secret could have paid the payroll taxes if he had
chosen to do so.   Secret asserts, however, that he never had the
authority to issue checks on his own initiative.

In the responsible person analysis, check signing authority is
relevant "only insofar as it demonstrates financial control."
<u>Vinick</u>, 205 F.3d at 12; <u>see also</u> <u>O'Connor</u>, 956 F.2d at 51 ("'The
mechanical dut[y] of signing checks . . . [is] not determinative of
liability under § 6672.'") (quotation omitted).  Here, the evidence
confirms that Secret had little, if any, actual control over
corporate funds.  He never issued a check without prior approval,
nor did he have permission to do so.  Indeed, when Muriale's failed
to pay his firm's accounting fee, Secret did not write a check to
reimburse himself.[5]  Moreover, he did not hold a corporate position
that  empowered  him  to  make  any  financial  decisions  for  the
restaurant.   The record otherwise reflects that Veltri granted
Secret check-signing authority as a matter of convenience and

---

[5]  As of January 31, 2001, Muriale's owed Secret and Shields
$11,500 in outstanding invoices.  (Def.'s Ex. 36.)  Veltri also
testified that Muriale's still owed Secret & Shields $6,000 to $10,000
when Veltri sold the restaurant.  (Tr. at 180.)

administrative efficiency. Therefore, the Court finds that Secret's check signing authority essentially constituted a "mechanical duty" and lacks probative weight in the responsible person determination.

The parties also sharply disagree about Secret's ability to dictate which creditors to pay. Veltri and Secret met or talked daily to discuss Muriale's aged accounts payable, its cash flow statement, vendor payment terms, and the restaurant's need for particular products and services. During those meetings, Veltri at least occasionally solicited Secret's input regarding disbursement decisions. Veltri trusted the financial advice offered by Secret, an experienced accountant and a "life-long" friend.

The Government argues that Secret "influenced" the decision to pay Muriale's creditors instead of payroll taxes. However, uncontraverted evidence demonstrates that Veltri made all final decisions on creditor payments. Moreover, no evidence suggests that Secret either recommended paying one creditor over another or discouraged Veltri from making tax payments. (See, e.g., Tr. at 204.) The Government otherwise fails to identify any instance in which Secret provided more than raw information or general advice about the restaurant's liabilities and financial status. Therefore, the Court finds that Secret did not personally determine which creditors to pay and when to pay them.

In light of the above findings, the purportedly analogous cases cited by the Government are readily distinguishable. In the bankruptcy case of <u>In re Thomas</u>, 187 B.R. 471 (E.D. Pa. 1995), the district court concluded that the debtor, the delinquent corporation's accountant, was a responsible person. Unlike Secret, however, the debtor in <u>Thomas</u> twice held himself out to be the corporation's treasurer, hired at least one corporate employee, and "had consistently significant, and perhaps at times exclusive, control in the determination of which of its creditors would be paid by [the corporation]." <u>Id.</u> at 476.

The Third Circuit's decision in <u>Greenburg v. United States</u>, 46 F.3d 239 (3d Cir. 1994), is also inapposite. In <u>Greenberg</u>, the court held that the plaintiff was a responsible person under § 6672 because, unlike Secret, he exercised substantial authority within the delinquent corporation. Specifically, the plaintiff was the corporation's in-house controller (an officer position), a member of its board of directors and a minority shareholder. 46 F.3d at 243. He also "played a role in the hiring and firing of employees." <u>Id.</u> Moreover, "his department was responsible for overseeing payment of [the corporation's] creditors." <u>Id.</u> at 241. By contrast, Secret held no ownership interest or position of authority in Muriale's.

### 3.   *Secret's Alleged Admissions of Responsibility*

The Government argues that, irrespective of his actual authority, Secret admitted responsibility for the trust fund liability to Revenue Officer Arthur.   During the May 2, 2000 meeting involving Arthur, Secret and Veltri, Secret answered questions about his duties and responsibilities for Muriale's. Arthur recorded Secret's answers on a Form 4180.   Secret subsequently reviewed and signed this form, thereby affirming the accuracy of its contents.

Form 4180 summarizes Secret's responsibilities as "comptroller/disbursements/payrolls – exception deposits." It also specifically indicates that Secret "direct[ed] (authorize[ed])" payment of bills," "deal[t] with major suppliers and customers," "sign[ed]/countersign[ed] corporate checks," "ma[de]/authorize[d] bank deposits," "authorize[d] payroll checks," "authorize[d] payment of federal tax deposits," and "determine[d] company financial policy."   The Government asserts that these representations, combined with Secret's knowledge of the unpaid tax liability, establish that Secret is a "responsible person."

Despite the Government's unwavering reliance on Secret's Form 4180, the Court finds the document rather unhelpful.   The form contains no express admission of responsibility or acknowledgment

of liability. (Tr. at 339.) It uses vague, undefined terms.[6]

Moreover, some of the statements in Form 4180, such as Secret's

ability to "determine company financial policy," are uncorroborated

by the independent evidence adduced at trial. The form also

appears somewhat internally inconsistent. For example, at

questions 13 and 14 in Section III, Form 4180 indicates that Veltri

alone "authorized or allowed" payments for operating costs, debts,

and remodeling costs. This characterization, however, contradicts

question 3 of Section II, which indicates that Secret directed or

authorized payment of bills. (See also Veltri's Form 4180, Pl.'s

Ex. 3.) Thus, in light of the confusion surrounding the purpose of

May 2, 2000 meeting, the Court highly doubts the accuracy--and

importance--of Secret's Form 4180.

The Government nonetheless contends that Secret's February 2,

2001 letter confirms his admission of responsibility in Form 4180.

Secret drafted this letter after learning that federal tax liens

were filed against him. He called Arthur to inquire about the

liens, and Arthur indicated that Secret admitted his responsibility

---

[6] For example, Section II, question 4 asks whether an individual
"deal[s] with major suppliers and customers." Such a broad
characterization could include anything from negotiation of prices to
fielding service complaints.

for Muriale's tax debt.[7]  Upon Arthur's recommendation, Secret

subsequently wrote the letter at issue to explain his duties and

thus contest any personal imposition of tax liability.

Secret's letter delineates the extent of his authority as an

accountant for Muriale's and notes that he "constantly stressed the

importance of paying [the payroll taxes] on a timely basis."

(Def.'s Ex. 36.)  The Government, however, emphasizes the following

statement at the end of the letter:

> I am fully aware of the severity of this tax liability
> owed by the corporation to the Internal Revenue Service.
> I am also aware that during a meeting in March or April
> 2000 in [the IRS] office I signed papers stating that I
> would be responsible on behalf of Muriale's Restaurant,
> Inc. However, it was my firm belief at the time that the
> company would be able to work itself out of the financial
> and cash flow problems that it had inherited when Michael
> took over, secure new financing, and pay off the
> liability in full.

(Id.)

In the above quote, the "papers" signed by Secret refer to

Form 4180.  As previously explained, however, Form 4180 does not

constitute an admission of responsibility.  Thus, Secret's letter

cannot confirm an admission that he never made.  Indeed, Secret

wrote the letter to _dispute_ liability.  Moreover, inasmuch as the

letter indicates that Secret admitted responsibility by signing

---

[7]  In light of the vague testimony as to this issue, it is
unclear how Arthur explained the reasoning behind the responsible
person determination.

"papers," it appears to memorialize Arthur's asserted justification for the imposition of tax liability. (Tr. at 278.) Therefore, the Court finds that, in signing Form 4180 and writing his February 2, 2001 letter, Secret did not admit responsibility for paying Muriale's withholding taxes.

The Government also maintains that Secret expressly admitted liability to Arthur during the May 2, 2000 meeting. At trial, Arthur testified that "Mr. Secret did make a statement during that time that he basically, you know, he says, I'll take responsibility for this and I think he confirmed that in a letter he wrote back to me, but he did make that statement." (Tr. at 71.) Arthur later conceded, however, that Secret did not say he would take responsibility for the <u>taxes</u>. (Tr. at 348). Moreover, Arthur's notes from the May 2, 2000 meeting fail to mention any such (extremely relevant) admission. (Pl.'s Ex. 1, at 23.) Secret also emphatically denies that he volunteered to be a "responsible person" for purposes of § 6672 liability. Indeed, the Government's contention that Secret, an outside accountant, willfully took responsibility for several thousand dollars of such liability defies common sense, irrespective of his friendship with Veltri. The Court thus finds that Secret did not expressly admit responsibility for the trust fund penalty.

### 4.    *Responsible Person Determination*

The preponderance of the evidence establishes that Secret did not have effective power to pay Muriale's withholding taxes.    In this case, only one Plett factor is satisfied, i.e., check signing authority, and is minimally probative of responsibility.  Moreover, Secret's duties largely comported with the services typically offered by a CPA.  See Vinick, 205 F.3d at 12 n.9.  The Court also rejects the Government's assertion that Secret admitted liability for the trust fund penalty.  Therefore, weighing the totality of the circumstances and applying the Plett factors, the Court concludes that Secret was not a responsible person under § 6672.

### C.    **Attorney's Fees**

In his post-trial briefs, Secret claims entitlement to attorney's fees.   Under 26 U.S.C. § 7430(a)(2), the "prevailing party" in a tax penalty refund case "may be awarded a judgment" for "reasonable litigation costs."   An individual is a "prevailing party" if he "substantially prevailed with respect to the most significant issue or set of issues presented," and if the Government's position was not "substantially justified."   Id. § 7430(c)(4).  A position is "substantially justified" if it has a reasonable basis in both law and fact.   Pierce v. Underwood, 487 U.S. 552, 563-64 (1988); Jean v. United States, 396 F.3d 449, 455 (1st Cir. 2005).   "On the other hand, if the Commissioner's

position merely possesses sufficient merit to avoid sanctions, it is not substantially justified." Barford v. Comm'r, 194 F.3d 782, 786 (7th Cir. 1999) (citing Estate of Cervin v. Comm'r, 111 F.3d 1252, 1261-62 (5th Cir. 1997)).

"[I]n evaluating whether the government's position is 'substantially justified' under § 7430, the relevant position of the government is exclusively the one taken in the actual litigation." Phillips v. Comm'r, 851 F.2d 1492, 1499 (D.C. Cir. 1988) (citation omitted). Moreover, "a substantial justification finding is based on all the facts and circumstances surrounding the case, not solely upon the final outcome." Barford, 194 F.3d at 786 (citing Phillips, 851 F.2d at 1499). The Government bears the burden of proving a substantial justification. 26 U.S.C. § 7430(c)(4)(B).

In the case at bar, the Court found by a preponderance of the evidence that Secret is not a responsible person for purposes of trust fund liability. Secret's remarkable carelessness, however, precipitated the instant litigation. Secret first erred by failing to read the Form 4180 that he signed on May 2, 2000. Irrespective of his belief about the purpose of the form, his failure to review the form was negligent, especially considering his training as a CPA. Had he not unthinkingly signed the form, Secret could have clarified his duties for Muriale's and perhaps

-22-

avoided the attempted imposition of tax liability.

Secret had other opportunities to resolve this matter extrajudicially and establish that he lacked effective power to pay the outstanding taxes. On three occasions, he received notices of the proposed imposition of trust fund recovery penalty, via certified mail. (Def.'s Mot. Summ. J. at Ex. 3-5.) All three notices were addressed to Secret, not Secret & Shields. Secret saw at least one of these notices, but failed to read it. (Tr. at 275.) The second sentence of each notice stated that "[the IRS's] efforts to collect [trust fund] taxes [from Muriale's] haven't been successful, so we plan to assess a penalty against you." The notices further indicated that if Secret did not agree with the assessment, he should contact Arthur within ten days from the date of the notice "to try to resolve the matter informally." Of course, Secret never responded to these notices because he never read them.

The Government otherwise reasonably inferred that Secret exercised decision-making authority with respect to creditor payments. Secret and Veltri are close friends, and they met daily to discuss which creditor invoices to pay. Veltri sometimes sought Secret's "advice" about creditor payments. Moreover, Secret was vested with significantly more responsibility during Veltri's ownership of Muriale's. Secret's Form 4180 also indicated that he

-23-

"direct[ed] (authorize[d]) payment of bills" and "determine[d] company financial policy." Thus, as the Court found in its Order denying summary judgment, Secret's degree of influence and control over the prioritization of creditor payments was a matter of genuine dispute.

Secret asserts that he clearly was not a responsible person because he only possessed check signing authority. That fact, however, was not established until after trial. Indeed, the Government has always maintained that Secret's authority was more expansive, and, as noted above, such an inference was reasonable in light of the circumstances of this case.

Secret also emphasizes Arthur's alleged failures to follow proper procedures. Nonetheless, this issue is largely irrelevant to the substantive merits of the Government's case. Regardless of whether Arthur properly handled Secret's assessment, the Government had an independent factual basis to pursue a trust fund recovery penalty.

In summary, Secret was derelict in the earliest stages of this dispute and appeared to possess a measure of decision-making authority within Muriale's. The preponderance of the evidence demonstrates that Secret is not a responsible person for purposes of trust fund liability, but he is not faultless in this matter. Considering the totality of the circumstances and the applicable

<u>Plett</u> factors, the Court thus finds that the Government's position in this case has a reasonable basis in fact and law.  Accordingly, the Court **DENIES** Secret's motion for attorney fees.

### III.  CONCLUSION

The Court concludes that Anthony O. Secret, Jr. is not a "responsible person" within the meaning of 26 U.S.C. § 6672. Therefore, the Court **DECLARES** that any federal tax liens issued by the IRS against Secret pursuant to § 6672 are null and void.  The Court also **ORDERS** the Government to refund Secret overpayments made to the IRS on May 9, 2002 and September 4, 2002 and abate any related interest and penalties.  Finally, the Court **DISMISSES** the case **WITH PREJUDICE** and directs the clerk to strike the case from the docket.

It is so **ORDERED**.

The Clerk is directed to transmit copies of this Order to counsel of record herein.

DATED: May _____6_____, 2005.

_____
IRENE M. KEELEY
UNITED STATES DISTRICT JUDGE